UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:18-CV-00016-JHM

ADA-ES, INC.                                                        PLAINTIFF

V.

BIG RIVERS ELECTRIC CORPORATION                         DEFENDANT

MEMORANDUM OPINION AND ORDER

This matter is before the Court on ADA-ES, Inc.'s Motion for Summary Judgment and [DN 165] and Big Rivers Electric Corporation's Motion for Summary Judgment [DN 172]. Fully briefed, this matter is ripe for decision. For the following reasons, ADA-ES, Inc.'s Motion for Summary Judgment is **GRANTED**. Big Rivers' Motion for Summary Judgment is **DENIED**.

I. BACKGROUND

After three and a half years of litigation, this case hinges on a simple question: Was Big Rivers Electric Corporation allowed to use Mississippi Lime Company's FGT Hydrated Lime when it conducted a performance test of a new Dry Sorbent Injection system at its Wilson Station power plant? If the answer is yes, the Dry Sorbent Injection system designed by ADA-ES did not meet the contractual guarantees. If the answer is no, Big Rivers never conducted a valid performance test and breached the contract when it withheld contract payments. The Court finds that the answer is no.

Power plants emit sulfur trioxide ("$SO_3$") into the air. If emitted in large amounts, $SO_3$ can harm the environment. Therefore, government regulations require power plants to reduce $SO_3$ emissions. Dry Sorbent Injection ("DSI") systems are a popular method to accomplish this $SO_3$ reduction. DSI systems operate quite simply: as gaseous emissions rise out of a power plant, the

1

DSI system injects a powder called a "dry sorbent" into the emissions.  The sorbent mixes with the emissions and neutralizes the $SO_3$.  "Hydrated lime" is a common sorbent in DSI systems, and it is what is at issue in this litigation.

Big Rivers Electric Corporation ("Big Rivers") operates the Wilson Station power plant in Centertown, Kentucky.  In 2014, Big Rivers decided to implement a DSI system at Wilson Station.  It issued a Request for Quote seeking bids for the project. [DN 172-7; 172-8].  Relevant here, the Request for Quote required any company bidding on the project to (1) reduce $SO_3$ emissions to five parts per million, and (2) use hydrated lime as the sorbent.  [DN 172-7 at 59].  ADA-ES, Inc. ("ADA") bid on the project and the parties began negotiations.  [DN 166-5].  After extensive negotiations, Big Rivers selected ADA's bid to design and implement the DSI system.  [DN 20-2; 20-5].

The final contract consists of two main documents: a Conformed Request for Quote ("CRFQ") [DN 20-5] and a contract with the technical requirements and performance guarantees ("Technical Contract").  [DN 20-2; 20-3].  These two documents cross-reference each other, and have several provisions that are relevant in this litigation:

1.  The Technical Contract states that the dry sorbent "shall be Hydrated Lime" and lists numerical specifications that the hydrated lime must satisfy.  [DN 20-2 at 20–21].

2.  The Technical Contract stipulates that the DSI system will (1) meet the $SO_3$ emissions guarantee of 5 ppm and (2) meet the emissions guarantee at a hydrated lime injection rate of 2,475 pounds per hour.  [DN 20-3 at 25].  The $SO_3$ emissions guarantee is a "Make Good" guarantee with no damage cap.  The hydrated lime injection rate is subject to liquidated damages capped at ten percent of the contract value.  [*See id.*, DN 20-5 at 6, § 1.22; DN 20-5 at 20, § 7.1].

2

3. The CRFQ states that the performance guarantees in the Technical Contract are "conclusively and finally determined by a successful passing of the agreed performance test." [DN 20-5 at 21, § 7.5.2].

4. The Technical Contract broadly outlines the format of the performance test. It states that the parties would separately agree on specific test protocols to govern the performance test. [DN 20-2 at 25, § 3.02].

The procedures governing the performance test are at the heart of the parties' dispute. After the DSI system was installed, ADA provided proposed performance test procedures to Big Rivers. [DN 20-7]. Big Rivers took ADA's proposed procedures and developed the final performance test protocols, called the CleanAir Protocol. [DN 166-20]. The CleanAir Protocol largely mirrors the Technical Contract, with a few key differences. The relevant difference here is the Technical Contract only specified "Hydrated Lime" as the sorbent to be used with the system, while the final CleanAir Protocol specified that "High Reactivity Hydrated Lime" was to be used during performance testing. [*Id.* at 5].

Big Rivers conducted its first performance test in March 2016. [DN 166-30]. The DSI system failed the test—it did not reduce $SO_3$ emissions to 5 ppm. Big Rivers ran the performance test with FGT Hydrated Lime ("FGT Lime"), a hydrated lime produced by Mississippi Lime Company. When Big Rivers notified ADA of the failed test, ADA claimed the test was not valid because FGT Lime was not a "High Reactivity Hydrated Lime," as required by the CleanAir Protocol. Big Rivers claimed the Technical Contract permitted the use of FGT Lime. [*See* DN 166-48].

Three months later, in June 2016, Big Rivers ran another performance test. [DN 166-29]. It used FGT Lime again. Same result—the DSI system failed the test. ADA again balked at Big

3

Rivers' use of FGT Lime.  Big Rivers again claimed FGT Lime was acceptable.  ADA countered that even if FGT Lime was acceptable, ADA's proposed "cure" for the failed test was to use Mississippi Lime Company's "premium" hydrated lime, High Reactivity Hydrated Lime ("HR Hydrated Lime").  Big Rivers refused.  [*See* DN 166-39].

After the second failed performance test, Big Rivers withheld its final contract payment of $563,382.56 and sought another $58,851.42 from ADA.  This was approximately twenty percent of the $2.7 million contract value.  [DN 125-21].  A few months later, Big Rivers withdrew the entire $807,651 letter of credit that ADA had posted with a bank as security for performance under the contract.  [DN 166-49].  Big Rivers claimed ADA had breached the contract and failed to cure.

ADA sued.  In its Amended Complaint, it alleged Fraud (Count I), Unjust Enrichment (Count II), a Declaratory Judgment as to seven claims (Count III), Breach of U.C.C. Warranties (Count IV), and Breach of Contract (Count V).  [DN 20].  Big Rivers filed a Counterclaim that alleged Breach of Contract (Counterclaim I), Breach of Express Warranties (Counterclaim II), Breach of Covenant of Good Faith and Fair Dealing (Counterclaim III), and Declaration of Rights for Attorneys' Fees (Counterclaim IV).  [DN 74].

Earlier in the case, this Court made a few decisions that narrow the issue presented now.  It held that four documents would be construed together when determining the performance test requirements: CRFQ, Technical Contract, ADA's proposed test procedures, and CleanAir Protocol.  *ADA-ES, Inc. v. Big Rivers Elec. Corp.* (*ADA-ES I*), No. 4:18-cv-16, 2019 WL 332412, at *5 (W.D. Ky. Jan. 25, 2019).  It held there is no damage cap for a breach of the $SO_3$ emissions guarantee because it is a "Make Good" guarantee.  *Id.* at *6–7.  It held that the contract documents are ambiguous regarding lime quality and extrinsic evidence is required to assist the Court's interpretation.  *Id.* at *7–8.  More recently, the Court determined the letter of credit is documentary,

4

and genuine issues of fact precluded summary judgment on ADA's two causes of action related to the letter of credit—Counts I and IV. *ADA-ES, Inc. v. Big Rivers. Elec. Corp.* (*ADA-ES II*), 465 F. Supp. 3d 703, 709–16 (W.D. Ky. 2020).

Discovery recently closed and both parties now move for summary judgment. ADA seeks summary judgment on its contract-related claims (Counts II and V) and all Big Rivers' counterclaims. [DN 165]. ADA does not seek summary judgment on its claims related to the letter of credit (Counts I and IV). Big Rivers seeks summary judgment on all its counterclaims and all ADA's causes of action. [DN 172].

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the nonmoving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the nonmoving party, the nonmoving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the nonmoving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the

[nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

Because both parties agree that lime quality is an important precursor to the causes of action in this case, the Court will first consider what lime quality was required for the performance test before turning to the causes of action.

#### A. There are Four Contract Documents

This Court previously determined that four documents must be construed together: the CRFQ, the Technical Contract, ADA's proposed performance test procedures, and the CleanAir Protocol. *ADA-ES I*, 2019 WL 332412, at *5. The reasoning was described therein:

> In the present case, the parties' [C]RFQ and [Technical] [C]ontract concern the same subject matter and were executed by the parties in respective sittings. Also, the [C]RFQ refers to the [Technical] [C]ontract and vice versa. Therefore, they must be construed together. Additionally, the [C]RFQ and [Technical] [C]ontract expressly call for the creation of the [proposed] Performance Test Procedures and CleanAir Protocol. Accordingly, those documents will also be construed together.

*Id*. Big Rivers asks the Court to revisit this holding. [DN 172 at 28–39; DN 184 at 40–41]. It argues the case should be decided based on the Technical Contract alone; the CleanAir Protocol should not be considered. The Court will not revisit the holding; however, it will explain why all four documents must be construed together.

Big Rivers' "essential purpose" for contracting with ADA was to receive a DSI system that reduced $SO_3$ emissions to 5 ppm. [DN 172 at 65]. This "essential purpose" is stipulated as a "Make Good" guarantee in the Technical Contract. [DN 20-3 at 25]. But the Technical Contract is silent about how to determine whether the "Make Good" guarantee is satisfied. One must look at the CRFQ to answer that question. The CRFQ (which was completed at the same time as the Technical Contract) clearly answers what the Technical Contract leaves silent: the performance

guarantees are "conclusively and finally determined by a successful passing of the agreed performance test set forth in the Contract Documents." [DN 20-5 at 21, § 7.5.2]. Therefore, the CRFQ and Technical Contract clearly contemplate an "agreed performance test" to determine whether the performance guarantees are met.

To find any detail about this "agreed performance test," however, one must turn *back* to the Technical Contract—the "agreed performance test" is described in Appendix 011101-A. [DN 20-2 at 25, § 3.02]. But even here, details are sparse. It generally describes the framework of the performance test and states that "[ADA] shall furnish performance test procedures and correction curves for [Big Rivers'] approval and use." [*Id*. at § 3.02(D)].

The takeaways from the Technical Contract and CRFQ are (1) the $SO_3$ emission performance guarantee is based on a performance test and (2) ADA and Big Rivers will separately develop performance test procedures to govern the performance test. The CleanAir Protocol is the document that provides the final procedures to be utilized for performance testing.   And ADA's proposed test procedures provide important context for the final CleanAir Protocol.  Since the Technical Contract and CRFQ expressly contemplate the creation of these documents, the four documents must be read together to determine the type of hydrated lime required to be used in the performance test.[1] *See Journey Acquisition-II, L.P. v. EQT Prod. Co*., 830 F.3d 444, 455 (6th Cir. 2016) (stating that Kentucky law requires all documents that are part of an agreement to be construed together).

---

[1] Big Rivers also claims ADA lacks standing to sue for violations of the CleanAir Protocol because it was an agreement between Big Rivers and the third-party testing contractor, and ADA was not an intended third-party beneficiary.  Big Rivers misconstrues the issues.  ADA did not sue for violations of the CleanAir Protocol.  It sued because Big Rivers did not pay what it owed under the contract.  [DN 20 at 74–75].  And Big Rivers' defense to this argument is that the DSI system did not meet the performance guarantee.  A performance test was the contractually agreed-upon method to determine whether the DSI system met the performance guarantee.  Therefore, a valid performance test was a prerequisite for Big Rivers' assertions that ADA did not fulfill its contractual obligations.

### B.  The Performance Test Did Not Permit FGT Lime

The parties agree that Big Rivers used FGT Lime, a product from Mississippi Lime Company, for the performance test at Wilson Station.  The primary issue is whether the contract documents permitted the use of FGT Lime for the performance test.  The CleanAir Protocol is the contract document that explicitly governed the performance test.  Previously, this Court concluded that extrinsic evidence was required to aid the Court's interpretation of this document.  *ADA-ES I*, 2019 WL 332412, at *7.

Where the terms of the contract are unambiguous, "[t]he construction, meaning, and legal effect of [the] contract is a matter of law for the court to decide . . . ."  *Siemens Bldg. Techs., Inc. v. BTS, Inc.*, No. 00-688, 2002 WL 32097057, at *2 (W.D. Ky. Feb 1, 2002).  The fact that the parties disagree about a contract's interpretation does not mean that it is ambiguous.  *See B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 594–95 (6th Cir. 2001) (noting that "disputed issues of contractual interpretation can be resolved at summary judgment on the basis that they are questions of law").  If the plain text is ambiguous, summary judgment is proper if the "extrinsic evidence presented to the court supports only one of the conflicting interpretations."  *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 410 (6th Cir. 2004).

The textual ambiguity in the CleanAir Protocol involves the term "High Reactivity Hydrated Lime."  The CleanAir Protocol states that

> Reagent provided for use in the Dry Sorbent Injection system performance testing *shall be High Reactivity Hydrated Lime* with the following properties:
> 1.  Size: 83% - 87% passing 325 US Standard Sieve
> . . .
> 9.  BET Surface Area ($m^2/g$): 20 or higher.

[DN 166-20 at 5 (emphasis added)].  The CleanAir Protocol does not define what qualifies as "High Reactivity Hydrated Lime."

As a textual matter, the parties dispute whether this provision of the CleanAir Protocol should be read descriptively or restrictively.  "Courts must interpret contracts 'giving effect to all parts and every word in it if possible.'"  *Cogent Sols. Grp., LLC v. Hyalogic*, *LLC*, 712 F.3d 305, 310 (6th Cir. 2013) (quoting *R & R, Inc. of Louisville v. Commonwealth,* 2005 WL 626391, at *2 (Ky. Ct. App. March 18, 2005)).  Big Rivers argues the phrase "High Reactivity" should be read descriptively—any hydrated lime meeting the numerical specifications is a "High Reactivity Hydrated Lime."  [*See* DN 172 at 39–40].  But the term "High Reactivity" would be superfluous if any lime meeting the numerical specifications qualified as a "High Reactivity Hydrated Lime." The simple phrase "hydrated lime" would suffice.[2]  The modifier "High Reactivity" would be read out of the contract.  *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (calling it a "cardinal principle of contract construction" that a contract "should be read to give effect to all its provisions and render them consistent with each other"); *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986) ("Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible.").  Instead, to give effect to every word, the CleanAir Protocol should be read to create two separate requirements: (1) the lime must qualify as a "High Reactivity" lime *and* (2) the lime must meet the numerical specifications.  This gives independent meaning to "High Reactivity" and keeps the provision from becoming redundant.

FGT Lime undisputedly met the numerical specifications.  The question is whether it was a "High Reactivity" lime, as the contract uses the term.  Since "High Reactivity Hydrated Lime" is not defined or otherwise specified in the CleanAir Protocol, extrinsic evidence was considered.

Since "parties to agreements . . . may depart from a usage of trade" when defining terms in a contract, a reviewing court should first look to the negotiations and course of performance

---

[2] The parties indeed use the term "Hydrated Lime," without the modifying phrase "High Reactivity," in the Technical Contract.  [*See* DN 20-2 at 20].

between the parties before considering usage of trade. Restatement (Second) of Contracts § 203 cmt. d. The court's goal is to identify what the parties meant by the ambiguous terms. *Central Bank & Trust Co. v. Kincaid*, 617 S.W.3d 32, 33 (Ky. 1981).

Here, the extrinsic evidence is capable of only one interpretation—the parties' negotiations establish that FGT Lime was not a "High Reactivity Hydrated Lime." ADA's initial bid, at the start of negotiations, offered a guaranteed feed rate of 3,630 pounds per hour. [DN 166-5 at 2, Table 3-1]. From there, the parties began negotiating. Big Rivers wanted a lower guaranteed feed rate, so ADA accommodated—it dropped the guaranteed feed rate to 3,300 pounds per hour if Big Rivers used "premium hydrated lime sorbents (e.g., Mississippi Lime's HR Hydrated Lime or equivelent [sic])." [DN 172-4 at 12, line 72]. In response, Big Rivers asked ADA for a "list of suppliers capable of providing the lime quality the bid is based upon." [*Id.*]. ADA replied that "[c]ommercially available *highly reactive hydrated limes* that meet ADA's specifications include those provided by Mississippi Lime (*HR Hydrated Lime*) and Lhoist/Sorbacal (SP Hydrated Lime), comparable highly reactive limes from . . . other suppliers may be available." [*Id.* (emphasis added)]. ADA attached a product data sheet for HR Hydrated Lime. [DN 190-13]. At that point, ADA had twice stipulated that the "premium" or "highly reactive" hydrated lime from Mississippi Lime Company was HR Hydrated Lime. ADA even specified that "other suppliers" may have comparable highly reactive limes but did not mention any other Mississippi Lime products—the only logical deduction is that no other Mississippi Lime products qualified.

Big Rivers claims it was focused only on the numerical specifications of the hydrated lime during negotiations, not the terminology. [DN 172 at 12]. That may be true, but it is a non sequitur. The question is whether the phrase "High Reactivity Hydrated Lime" *had an established meaning* between the parties, not whether it was the focal point of negotiations.

Big Rivers' executive confirmed that Big Rivers did not believe ADA's references to "highly reactive" or "premium" limes during that time period included FGT Lime.  [DN 190-9 at 137:25–138:6].  Big Rivers knew when ADA used the phrase "High Reactivity Hydrated Lime," it meant HR Hydrated Lime and no other Mississippi Lime Company products.

The clear takeaway from the course of negotiations is that the term "High Reactivity Hydrated Lime" included HR Hydrated Lime but did not include any other Mississippi Lime Company products.  FGT Lime is a lower quality lime than HR Hydrated Lime, and it served as the comparison in the HR Hydrated Lime data sheet ADA shared with Big Rivers.  [DN 190-13].  Thus, there is but one interpretation—the term "High Reactivity Hydrated Lime" did not include FGT Lime.  Therefore, the CleanAir Protocol did not permit Big Rivers' use of FGT Lime.  Since the term had an established definition between the parties to this agreement, it is unnecessary to consider usage of trade.  *See* Restatement (Second) of Contracts § 203 cmt. d.[3]

### C.  Technical Contract Does Not Override the CleanAir Protocol

The finding that the CleanAir Protocol did not permit the use of FGT Lime, however, does not definitively resolve the issue.  There is a potential complication—the Technical Contract does not use the term "High Reactivity Hydrated Lime."  It states:

> Reagent provided for use in the Dry Sorbent Injection systems *shall be Hydrated Lime*.
>> A.  Size: 83% - 87% passing 325 US Standard Sieve
>> . . .
>> I.   BET Surface Area (m²/g): 20 or higher.

___

[3] Both parties produce multiple experts that opine on hydrated lime trade terminology and the meaning of the contract terms.  Since the contract term can be resolved without resorting to usage of trade, however, expert testimony is unnecessary.

[DN 20-2 at 20–21 (emphasis added)].  Thus, there is a discrepancy between what sorbent is required—the CleanAir Protocol requires "*High Reactivity* Hydrated Lime" but the Technical Contract only requires "Hydrated Lime."

Big Rivers advocates that the Technical Contract should control over the CleanAir Protocol.  It advances two related arguments in support of this claim.  First, it argues that the Technical Contract allows Big Rivers' use of any hydrated lime meeting the numerical specifications.  Second, it argues that the phrase "High Reactivity" is only in the CleanAir Protocol because ADA added it in its proposed test procedures, and this "modification" was a unilateral attempt to change the contract and is legally invalid.  [DN 172 at 33].  The Court will address each argument in turn.

### 1.   Technical Contract Allows FGT Lime

Big Rivers first argument—the Technical Contract permits any hydrated lime that meets the numerical specifications—is correct.  During negotiations, after ADA clarified that HR Hydrated Lime was the Mississippi Lime product that met its specifications, Big Rivers asked ADA to provide the numerical specifications.  [DN 172-4 at 12, line 72].  Since ADA had previously mentioned two specific "high reactivity" products (HR Hydrated Lime from Mississippi Lime Company and SP Hydrated Lime from Lhoist), it compared the numerical specifications of those two products to determine the least common denominator.  [DN 190-16].  Notably, it required a minimum BET Surface Area of 21 $m^2/g$, in an attempt to exclude non-"high reactivity" products.  [*Id*.].  But ADA apparently did not realize that Mississippi Lime Company's FGT Lime had the same BET surface area as the "high reactivity" HR Hydrated Lime—as a result, it mistakenly wrote the numerical specifications in a way that included FGT Lime.  ADA compounded this problem by not including a "High Reactivity Hydrated Lime" requirement in the

Technical Contract.  [DN 20-2 at 20–21].  The Technical Contract unambiguously requires only (1) "Hydrated Lime" and (2) the hydrated lime must meet the numerical specifications.  FGT Lime satisfies both requirements.

ADA claims the "correction curves" in the Technical Contract establish that FGT Lime was not sufficient.[4]  But these correction curves, while they show ADA *intended* to require an "enhanced" lime, cannot alter the clear specifications in the Technical Contract.  The Technical Contract clearly states the DSI system sorbent "shall be Hydrated Lime" and lists numerical specifications.  [DN 20-2 at 20–21].  Since FGT Lime meets both requirements, the Technical Contract permits FGT Lime.

### 2.   ADA Did Not Breach in Drafting Proposed Test Protocol

Big Rivers' second argument—that ADA's addition of "High Reactivity" in its proposed performance test procedures is legally ineffective because it was a unilateral modification—fails. To understand why, it is important to understand the process of developing the CleanAir Protocol: (1) ADA submitted its proposed performance test procedures (this is where ADA added the words "High Reactivity") [DN 190-79], (2) Big Rivers reviewed the proposed test procedures and sent ADA a redline with changes [DN 184-14], (3) Big Rivers and a third-party project engineer developed the final test procedures (without ADA's input) [DN 166-28], (4) Big Rivers sent the

---

[4] The correction curves are graphs showing the expected $SO_3$ emissions at various hydrated lime injection rates. [DN 20-3 at 26].  The title of the correction curves clearly states the rates are based on "Enhanced Hydrated Lime w/ [sic] Static Mixer," [*id.*], and the correction curves are the exact same curves that ADA sent during negotiations, when it lowered the guaranteed injection rate if Big Rivers used a "highly reactive hydrated lime" such as HR Hydrated Lime.  [DN 190-17].

final test procedures to ADA, and (5) Big Rivers contracted with a third-party to perform the performance test—the final test procedure in this fifth step is the CleanAir Protocol.

Given this backdrop, Big Rivers' claim that ADA "unilaterally" changed the lime quality falls flat. While ADA may have added the terminology in the first instance, Big Rivers had *complete control* over steps two through five. ADA merely submitted its proposed procedures—Big Rivers took the proposed procedures and developed the CleanAir Protocol itself. At the very least, Big Rivers assented to ADA's proposed addition of "High Reactivity" during these four steps that it had complete control.

Also, the evidence belies any claim that ADA "hid" this change from Big Rivers or that Big Rivers merely was a rubber stamp for ADA's proposed test procedures. After ADA submitted the proposed procedures, Big Rivers sent back a redline of changes. [DN 184-14]. Big Rivers made multiple changes in the twenty-page document, but it did not change the lime quality. Additionally, between ADA's submission and the final CleanAir Protocol (remember that Big Rivers had complete control over the procedures during this time period), there were significant changes made to the document, including a change to the *exact same line* that Big Rivers now claims ADA hid from it. *Compare* [DN 20-7 at 18 ("Reagent provided for use in the Dry Sorbent Injection systems shall be High Reactivity Hydrated Lime . . .")], *with* [DN 166-20 at 5 ("Reagent provided for Dry Sorbent Injection system *performance testing* shall be High Reactivity Hydrated Lime . . .") (emphasis added)]. But even though Big Rivers made changes to the exact same sentence, it kept the "High Reactivity" requirement. This evidence contradicts Big Rivers' claims that ADA unilaterally made the change and hid it from Big Rivers.

Undeterred, Big Rivers also claims ADA's addition of "High Reactivity" was invalid for a second reason—a provision in the Technical Contract required ADA to call any later "deviations"

14

to Big Rivers' attention.  [*See* DN 20-2 at 49–50, § 1.03(D)(2)(d)].  This argument fails for two reasons.  First, Big Rivers' cited contract provision is in a section titled "Technical Submittals," [*id*. at 45, § 1.03], and the Technical Contract defines "Technical Submittals" as "Shop Drawings, product data, and Samples."  [*Id*. at 43, § 1.02(A)(1)].  ADA's proposed test procedures do not appear to be "Shop Drawings, product data, [or] Samples" as the terms are defined in the contract, and Big Rivers does not argue that they are.  [*See* DN 184 at 44].  Thus, Big Rivers' argument, while creative, simply does not cover the situation at hand.

Second, even if this contract provision did apply to ADA's proposed performance test procedures, adding the term "High Reactivity" is not a "deviation."  Neither party's expert witnesses claim "deviation" has any special trade meaning.  Therefore, the word's ordinary meaning controls.  *See Bituminous Cas. Corp. v. Kenway Contracting, Inc*., 240 S.W.3d 633, 638 (Ky. 2007).  The Merriam-Webster Dictionary defines "deviate" as "to stray especially from a standard, principle, or topic," or "to depart from an established course or norm."  *Deviate*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/deviate.  Here, ADA's addition of "High Reactivity" is not logically read as "stray[ing]" or "depart[ing]" from the Technical Contract.  The words "stray" and "depart" suggest leaving one standard entirely, in favor of a different standard.  For example, Merriam-Webster's example of "depart" in a sentence is "Our flight departs at 6:15 am."  *See Depart*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/depart.  When a flight departs, the traveler is no longer in the first location.  They "depart" to an entirely different location.  But that is not what ADA did.  ADA did not "depart" to an entirely new set of hydrated lime requirements.  It merely specified a *subset* of hydrated limes within the same requirements.  The Technical Contract allowed any hydrated lime that met the numerical specifications.  ADA's proposed test procedures kept the *same*

15

specifications but specified the hydrated lime must also be "high reactivity."  This simply added one more requirement; it did not change any requirements.  Returning to the airport analogy, ADA did not suggest "departing" to a different location—it simply requested a specific spot within the location they were already in.  The addition of "high reactivity" thus is not a "deviation."  No factfinder could reasonably conclude that ADA breached the contract when it submitted its proposed test procedures.

### 3.  CleanAir Protocol Controls the Technical Contract

The Court is thus left with a conflict between the CleanAir Protocol and the Technical Contract.  The CleanAir Protocol requires a higher quality hydrated lime than the Technical Contract, and FGT Lime satisfies the Technical Contract but does not satisfy the CleanAir Protocol.

"It is a familiar principle of legal construction that the specific provisions of a contract are to be given preference over the general provisions, and if there is a conflict between the two any reconciliation should give full effect to the more specific."  *BLC Lexington SNF, LLC v. Oatis*, No. 5:19-cv-284, 2019 WL 6221006, at *9 (E.D. Ky. Nov. 20, 2019) (quoting *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 596 (6th Cir. 2001)).  Here, when deciding whether the emissions guarantee is satisfied, one must look to the specific document that governs the test: the CleanAir Protocol.  ADA's $SO_3$ emissions guarantee rested on a performance test, and the Technical Contract expressly stipulated that the CleanAir Protocol would govern the performance test.  The CRFQ and Technical Contract provide the overall parameters for system performance but do not provide the parameters for the performance test.

Here, the CleanAir Protocol required Big Rivers to conduct a performance test with "High Reactivity Hydrated Lime." Big Rivers did not use a "High Reactivity" lime—it used FGT Lime. Big Rivers did not conduct a valid performance test.

### D. Big Rivers Breached the Contract

Given the foregoing findings that Big Rivers' performance test did not comply with the CleanAir Protocol, the Court now considers the causes of action.

Under Kentucky law, which governs the contract actions in this case, a breach of contract claim requires (1) existence of a contract, (2) breach of contract, and (3) damages. *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019). Kentucky follows the first breach rule, which states that the first party to commit a material breach cannot complain of subsequent nonperformance by the opposing party. *ClubSpecialists Intl., LLC v. Keeneland Ass'n, Inc.*, No. 5:16-cv-345, 2018 WL 2050134, at *2 (E.D. Ky. May 2, 2018). The nonbreaching party is excused from further performance and can sue for damages. *Mostert v. Mostert Grp., LLC*, 606 S.W.3d 87, 94 (Ky. 2020).

In this case, the first breach occurred when Big Rivers did not conduct a valid performance test and subsequently withheld money from ADA. Section 3.02(A) of the Technical Contract states "Performance and acceptance tests will be performed by the Owner as specified below . . ." [DN 20-2 at 25]. The remainder of Section 3.02 outlines the test procedures, including the requirement that Big Rivers and ADA would "mutually agree on test procedures." [*Id*. § 3.02(D)]. When Big Rivers did not conduct a valid performance test, it breached Section 3.02 of the Technical Contract. Big Rivers also breached Section 7.4 of the CRFQ when it did not pay the entire amount due within twelve months of equipment delivery. [DN 20-5 at 21]. These breaches were undisputedly material—the parties specifically negotiated for hydrated lime quality, it was

mentioned repeatedly throughout the various contract documents, and ADA immediately objected when Big Rivers used FGT Lime in the performance test.  [DN 172 at 46].  Big Rivers, therefore, committed the first material breach.  This breach excused ADA from any further obligations.  *See Mostert*, 606 S.W.3d at 94.

Even if Big Rivers could use FGT Lime in the performance test, withholding more than ten percent of the contract value was still unreasonable.  To make any plausible claim for damages beyond liquidated damages (which were capped at ten percent of the contract value), Big Rivers needed to show the DSI system could not reduce $SO_3$ emissions below 5 ppm, thus failing the "Make Good" guarantee.  Big Rivers' Vice President testified that he understood the "Make Good" guarantee meant ADA would do "[w]hatever it would take" to get $SO_3$ emissions to 5 ppm, including using a different lime that "met the technical specification."  [DN 190-2 at 101:6–101:20].  HR Hydrated Lime undisputedly "met the technical specification" of the Technical Contract and CleanAir Protocol—it exceeded all nine numerical specifications.  Thus, Big Rivers at least had to attempt ADA's proposed "cure" of using HR Hydrated Lime instead of FGT Lime, even if the contract documents only required FGT Lime.

Big Rivers attempts to argue that HR Hydrated Lime was an unreasonable cure if the contract only required FGT Lime.  Its rationale essentially distills to an assessment that it did not think the performance increase was worth the price difference.  [DN 184 at 58–62].  This post hoc rationale does not appear in the contract documents, rendering it meaningless as a matter of law.  If Big Rivers wanted to limit ADA's proposed cures for performance guarantee failures, it could have specified as much in the contract.  But the contract documents recognize no limitations on ADA's proposed cures if the DSI system failed the $SO_3$ emissions guarantee—they also recognize

no limit on the damages Big Rivers can recover for that failure.  Thus, price alone cannot justify Big Rivers' refusal to try HR Hydrated Lime for the performance test.

The Court recognizes it is anomalous that the contract documents permit one type of hydrated lime for regular use and a different hydrated lime for performance testing.  But this anomaly cannot change the result. The Court cannot rewrite the contract for the parties.  The evidence shows these two sophisticated parties unambiguously agreed a performance test would conclusively determine the $SO_3$ emissions guarantee, and they unambiguously agreed that separate test protocols should govern the performance test.  Both parties had input in developing the test protocols, and Big Rivers had the final say.  So, whether the inclusion of the phrase "high reactivity hydrated lime" was an oversight by Big Rivers, or a miscommunication among employees, is not for the Court to decide.  The Court's job is to enforce the contract documents according to their terms.  *See AES-Apex Emp. Servs., Inc. v. Rotondo*, 924 F.3d 857, 863 (6th Cir. 2019) ("We honor the intent of the parties by enforcing their agreement as written—not based on whatever vague purposes can be supplied after the fact." (internal quotations omitted)).

Because a factfinder could not reasonably find for Big Rivers, the Court **GRANTS** ADA's motion for summary judgment on its breach of contract claim (Count V).[5]  It also **GRANTS** ADA's motion for summary judgment on Big Rivers' breach of contract counterclaim (Count I). Since Big Rivers' counterclaim for breach of covenant of good faith and fair dealing also relies on Big Rivers conducting a valid performance test, the Court also **GRANTS** ADA's motion for summary judgment on Count III of Big Rivers' counterclaim.

---

[5] ADA pled unjust enrichment in the alternative.  Since the parties have an enforceable contract, ADA cannot maintain an unjust enrichment claim.  *See Humana, Inc. v. Cave Consulting Grp., Inc.*, No. 3:13-cv-759, 2014 WL 12911068, at *5 (W.D. Ky. Nov. 21, 2014) ("Kentucky law is well established that the doctrine of unjust enrichment has no application in those cases where an explicit contract exists between the parties and the contract has been performed."); *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977) ("The doctrine of unjust enrichment has no application in a situation where there is an explicit contract which has been performed.").

### E.  ADA Count 1: Common Law Fraud

Turning to the claims involving Big Rivers' draw on the letter of credit, Big Rivers first moves for summary judgment on ADA's common law fraud claim.  Big Rivers previously moved for summary judgment on this count, and the Court determined genuine issues of material fact about the falsity of Big Rivers' statement and Big Rivers' knowledge of falsity precluded summary judgment.  *ADA-ES II*, 465 F. Supp. 3d 703, 709–11 (W.D. Ky. 2020).  Big Rivers now renews its motion.

> To succeed on a fraud claim under Colorado law, ADA must show that Big Rivers delivered a signed writing to the Bank which: (1) falsely stated that . . . ADA breached the contract and failed to cure . . . ; (2) which Big Rivers knew or should have known was false; (3) which was presented to the Bank in order to receive the Letter of Credit funds; (4) which was relied on by the Bank in paying on Big Rivers' demand; and (5) which resulted in a loss of approximately $807,651.00 to ADA.

*Id*. at 709; *see Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013); *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012) (outlining the elements).  The Court previously determined that the last three elements were not in dispute, and the conclusion that ADA did not breach the contract means that the first element is satisfied, as well.  The only remaining issue is Big Rivers' intent.

Under Colorado law, a party acts with fraudulent intent if a statement is made with knowledge of its falsity or reckless disregard of its truth or falsity.  *Moses v. Hovis*, No. 16-cv-1173, 2017 WL 4012130, at *5 (D. Colo. Sept. 12, 2017) (quoting *Bemel Assocs., Inc. v. Brown*, 435 P.2d 407, 409 (Colo. 1967)).  There remains a genuine issue of material fact whether Big Rivers made the draw request with reckless disregard of its truth.  ADA has presented evidence suggesting Big Rivers knew HR Hydrated Lime met the numerical specifications but nevertheless averred that ADA proposed a "different" lime for performance testing.  It also suggested that Big

Rivers intentionally withheld correspondence about ADA's proposed "cure" for the performance test, in order to mislead the bank.  [DN 190 at 110–111].  Given the foregoing, and the fact that intent typically is a question of fact, there is a factual dispute about Big Rivers' intent that precludes summary judgment.

Big Rivers renewed motion for summary judgment on ADA's common law fraud cause of action is **DENIED**.

### F.  ADA Count IV: Breach of U.C.C. Warranties

Big Rivers also moves for summary judgment on ADA's fourth cause of action—Breach of U.C.C. Warranties flowing from Big Rivers' draw on the letter of credit.  In a prior opinion, the Court determined the letter of credit is documentary and that, to succeed on the breach of warranty claim, ADA must show Big Rivers committed a "material fraud" when it drew on the letter of credit because it had "no colorable right to expect honor." *ADA-ES II*, 465 F. Supp. 3d at 712–15. Big Rivers now renews its motion for summary judgment. It supports its motion with two separate arguments: (1) ADA breached the contract and failed to cure, so the breach of warranty claim necessarily fails; and (2) even if Big Rivers breached the contract, it at least had a "colorable right" to support its draw request.

Colorado law governs the Breach of U.C.C. Warranties claim because it involves the letter of credit.  The relevant warranty here is C.R.S. § 4-5-110(a)(1), which states:

> (a) If its presentation is honored, the beneficiary warrants:
> (1) To the issuer, any other person to whom presentation is made, and the applicant that there is no fraud or forgery of the kind described in section 4-5-109(a);

C.R.S. § 4-5-110(a)(1).  The official comment to Section 109, in turn, states that "[m]aterial fraud by the beneficiary occurs only when the beneficiary has no colorable right to expect honor and where there is no basis in fact to support such a right to honor."  C.R.S. § 4-5-109 cmt. 1.

Therefore, a U.C.C. warranty claim requires (1) the presentation of a letter of credit, (2) honoring of the letter of credit, and (3) material fraud by the beneficiary, defined as "no colorable right to expect honor and . . . no basis in fact to support such a right to honor." Only the third element is contested in this case. The Court previously found that "whether fraud occurred 'appears to present a factual question which cannot be resolved on summary judgment.'" *ADA-ES II*, 465 F. Supp. 3d at 713 (quoting *Ward Petroleum Corp. v. Fed. Deposit Ins. Corp.*, 903 F.2d 1297, 1301 (10th Cir. 1990)).

The Court sees no reason to depart from its earlier decision that fraud is a factual question that should not be resolved at this time. Big Rivers only had a colorable basis for drawing on the letter of credit if it had a credible reason to believe ADA breached the $SO_3$ emissions performance guarantee and failed to cure. There is evidence in the record that Big Rivers knew the CleanAir Protocol required HR Hydrated Lime but refused to use it. [DN 190 at 43–50]. If this is established at trial, Big Rivers has no credible reason to believe ADA failed to cure. There is also evidence that Big Rivers stopped the performance test when hydrated lime consumption exceeded the guaranteed feed rate by ten percent. [DN 166-33]. If Big Rivers knew the system would satisfy the $SO_3$ emissions guarantee by increasing the feed rate, but stopped the performance test anyway, it had no credible reason to withhold any money beyond the ten percent liquidated damages cap. These factual questions preclude summary judgment.

Big Rivers renewed motion for summary judgment as to ADA's Breach of U.C.C. Warranties claim is **DENIED**.

### G.  Big Rivers Count II: Breach of Express Warranties

Both parties move for summary judgment on Big Rivers' second cause of action: Breach of Express Warranties. Big Rivers bases this cause of action on three express warranties that were

allegedly violated by ADA's actions: (1) the DSI system did not reduce $SO_3$ emissions to 5 ppm or reduce sound pressure levels, (2) ADA did not conduct a root cause investigation, and (3) the DSI system did not meet industry standards.  [DN 74 at ¶¶ 77–84; DN 172 at 56–58].  The first two allegations necessarily fail because they are tied to the breach of contract claims.  Since Big Rivers never conducted a valid performance test, there is no basis for the conclusion that the DSI system did not reduce $SO_3$ emissions or reduce sound levels.  Likewise, ADA never had a duty to conduct a root cause investigation because the DSI system never failed a valid performance test.

The third basis for the Breach of Express Warranties claim, however, raises separate issues.  Big Rivers alleges ADA's design did not conform to industry standards because the piping and splitters were poorly designed.  According to Big Rivers, this violates section 7.5.3(d) of the CRFQ, which states "any labor or services performed pursuant to this Agreement shall be performed in a competent, diligent, and timely manner in accordance with idustry [sic] accepted standards."  [DN 20-5 at 21].

For the reasons stated in the accompanying Motion to Exclude Expert Testimony [DN 215], Big Rivers has not proven that ADA's "tapered" splitter design *actually* causes uneven hydrated lime dispersion or that the long elbow-shaped curves *actually* create an unnecessary risk of "roping."  Therefore, Big Rivers has no basis to state that ADA's design did not conform to industry standards.  For these reasons, ADA's motion for summary judgment is **GRANTED** as to Big Rivers' Breach of Express Warranties counterclaim.

### H.  Big Rivers Count IV: Attorneys' Fees

Finally, Big Rivers claims it is entitled to attorneys' fees under the agreement.  It claims that the contract allows recovery of its attorneys' fees even as the nonprevailing party.

Under Kentucky law, the general rule is that "with the exception of a specific contractual provision allowing for recovery of attorneys' fees or a fee-shifting statute, . . . each party assumes responsibility for his or her own attorneys' fees." *Hogancamp v. Callaway*, No. 5:08-cv-152-JHM, 2012 WL 2994264, at *3 (W.D. Ky. July 20, 2012) (quoting *Aetna Cas. & Surety Co. v. Commonwealth,* 179 S.W.3d 830, 842 (Ky. 2005)).   Here, the contract provision covering attorneys' fees states

> Enforcement of Rights: Company shall have the right to recover from Contractor all expenses, including but not limited to fees for and expenses of inside or outside counsel hired by Company, arising out of Contractor's beach of this Agreement or any other action by Company to enforce or defend Company's rights hereunder.

[DN 20-5 at 40, § 7.29.5].   Big Rivers asserts that the plain meaning of "defend" compels attorneys' fees for Big Rivers regardless of success because it "defend[ed] its rights when ADA sued.  [DN 172 at 61–62].  The Court does not agree.  The primary definition of "defend," and the one most applicable to this context, is "to drive danger or attack away from."  *Defend*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/defend.  Therefore, the phrase "defend Company's rights hereunder" means Big Rivers is "driving danger or attack away from" its contractual rights.  [*See* DN 20-5 at 40].  But Big Rivers' contractual rights are not under attack if those rights do not exist in the first place.  And the rights do not exist unless Big Rivers succeeds on the underlying claims.  It cannot "driv[e] . . . attack away from" a nonexistent contractual right.

Further, the phrase "enforce or defend" cannot be read in isolation.  *See AES-Apex*, 924 F.3d at 862 (stating that the Sixth Circuit "do[es] not interpret contract language in isolation" and contract language must be read in context).  The full clause of the attorneys' fees provision gives Big Rivers the right to recover attorneys' fees for all expenses "arising out of [ADA's] breach of this Agreement or any other action by [Big Rivers] to enforce or defend [Big Rivers'] rights hereunder."  [DN 20-5 at 40].  Applying normal principles of contract interpretation, this provision

24

identifies two types of actions that trigger the attorneys' fees provision: (1) breach of contract by ADA, or (2) "any other action" by Big Rivers where it "enforce[s] or defend[s] its rights." The first triggering action is specific—breach of contract. The second triggering action is a general catch-all provision. And the two phrases are connected by an inclusive phrase ("or any other action"). The word "other" in the connecting phrase implies that the generic catch-all provision consists of actions similar to the specific example (breach of contract). Big Rivers only can utilize the first provision if it is the prevailing party (i.e., ADA breached the contract). Thus, it can only utilize the second catch-all provision if it prevails on another type of contract-related action. The catch-all provision does not expand the scope of this provision.

Big Rivers claims *BKB Properties, LLC v. SunTrust Bank*, 453 F. App'x 582 (6th Cir. 2011), supports its interpretation. But that case is inapposite because the fee-shifting provision in that case had a clear triggering event—retention of legal counsel. *Id*. at 588. The plaintiff did not even contest the provision's applicability before the Sixth Circuit—it only argued that fee-shifting regardless of success was unconscionable. *See id*. So, while *BKB Properties* certainly recognizes that contract provisions allowing one party to recover attorneys' fees regardless of success are sometimes enforceable, it sheds no light on whether "enforce or defend" is sufficient to trigger that duty. Unlike *BKB Properties*, there has not been a clear triggering event in this case. The phrase "enforce or defend" does not permit recovery of attorneys' fees for a nonprevailing party.

Big Rivers cannot recover attorneys' fees because it lacked a contractual right to withhold contract payments or draw on the letter of credit. ADA's motion for summary judgment on Big Rivers' fourth cause of action for attorneys' fees is **GRANTED**. Big Rivers' motion for summary judgment is **DENIED**.

### IV. CONCLUSION

To summarize, the Court grants summary judgment for ADA on (1) the competing Breach of Contract claims, (2) Big Rivers' counterclaim for Breach of Covenant of Good Faith and Fair Dealing, (3) Big Rivers' counterclaim for Breach of Express Warranties, and (4) Big Rivers counterclaim for Declaration of Rights for Attorney's Fees. The following issues remain outstanding for trial:

- ADA's claim for Fraud (Count I).

- ADA's claim for Breach of U.C.C. Warranties (Count IV).

For the reasons set forth above, **IT IS HEREBY ORDERED** that ADA-ES, Inc.'s Motion for Summary Judgment [DN 165] is **GRANTED**. Big Rivers Electric Corporation's Motion for Summary Judgment [DN 172] is **DENIED**.

*Joseph H. McKinley*

Joseph H. McKinley Jr., Senior Judge

United States District Court

November 23, 2020

cc:      Counsel of Record